**COURT OF APPEALS
DECISION
DATED AND FILED**

**November 25, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.   2023AP2303**

**STATE OF WISCONSIN**

Cir. Ct. Nos.  2016CV642
2016CV662
2017CV20
2017CV52
2019CV516

**IN COURT OF APPEALS
DISTRICT I**

SAUK PRAIRIE CONSERVATION ALLIANCE,

PETITIONER-APPELLANT,

V.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
WISCONSIN NATURAL RESOURCES BOARD AND
WISCONSIN DEPARTMENT OF ADMINISTRATION,

RESPONDENTS-RESPONDENTS.

APPEAL from orders of the circuit court for Sauk County: PATRICIA A. BARRETT, Judge. *Affirmed*.

Before White, C.J., Colón, P.J., and Geenen, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   The Sauk Prairie Conservation Alliance (Alliance), an environmentalist group, appeals from orders of the circuit court dismissing its petitions for judicial review of the actions of the Wisconsin Department of Natural Resources (DNR), the Wisconsin Natural Resources Board (NRB), and the Wisconsin Department of Administration (DOA) in relation to the Sauk Prairie State Recreation Area (SPSRA).   Alliance generally challenges SPSRA's designation as a state recreation area, the approval of SPSRA's master plan, and the contested case hearing that Alliance was granted as part of the proceedings in this matter.  For the reasons set forth below, we affirm.

## BACKGROUND

¶2     SPSRA is part of a larger portion of land consisting of roughly 7,354 acres adjacent to Devil's Lake State Park in Sauk County, Wisconsin.  For many decades, this larger portion of land served as the Badger Army Ammunitions Plant established during World War II for the production of military propellants.  At one point, the plant was the largest propellant manufacturing plant in the world.  The plant contained thousands of buildings, hundreds of miles of roadways, railways, and elevated steam pipes.  Operations at the plant ended around 1975.  However, after years of heavy industrial use, the soil and groundwater were highly contaminated with substances such as asbestos, lead paint, toxic industrial chemicals, and oil.  Cleanup efforts ensued, and the plant was decommissioned in 1997 by the United States Department of Defense.

¶3     Following the decommission of the plant, state and local officials formed a task force, known as the Badger Reuse Committee, for the primary

purpose of planning for future state ownership of the land. Members of the committee included a DNR representative, tribal representatives, and representatives from nonprofit organizations, such as Alliance. In 2001, the committee's work culminated in issuing the Badger Reuse Plan. The Badger Reuse Plan proposed that SPSRA be used for conservation and low-impact recreation uses.

¶4 In 2004, DNR submitted an application to the Federal Lands to Parks Program to acquire the land for SPSRA. DNR's application was approved the next year, and beginning in 2010, the United States National Park Service (NPS) transferred large portions of the land to DNR through the program. The land transfers contemplated use of the land for public recreation and public park land, but there was also deed language reserving rights to certain existing uses, including use of the property by the Wisconsin Army National Guard for helicopter training and drills and access to the land by the United States Army. In total, approximately 3,385 acres were transferred to DNR ownership for what is now SPSRA.

¶5 DNR formally began the master planning process for SPSRA starting around 2012. The master planning process culminated in the 2016 Master Plan, which included a Final Environmental Impact Statement (FEIS). The 2016 Master Plan allowed certain uses, including dual-sport motorcycling, dog training and trialing, and special events such as paintballing. These uses, however, had not been recommended as uses by the Badger Reuse Committee in the Badger Reuse Plan. The 2016 Master Plan also recognized that the Wisconsin Army National Guard would continue its helicopter training and drills on the property. Overall, though, the 2016 Master Plan focused on the fact that the plan as a whole would

improve the environment because a former munitions plant was being converted into a state recreation area that would be focused on conservation.

¶6    Alliance and others voiced opposition on several occasions during the master planning process and following the adoption of the 2016 Master Plan to what they termed "high-impact"[1] uses that were inconsistent with the overall conservation and low-impact uses recommended in the Badger Reuse Plan.

¶7    Alliance filed its first petition for judicial review in Sauk County Circuit Court on December 8, 2016, seeking review of a draft of the 2016 Master Plan. Alliance claimed that the inclusion of these high-impact uses such as rocketry,[2] dog training and trialing, dual-sport motorcycling, and special events including paintball events, were inconsistent with the uses contemplated in the land transfers from NPS and asserted that the plan was approved by DNR with an insufficient environmental analysis of the impact of these uses. Overall, Alliance alleged that DNR and NRB violated the Wisconsin Environmental Policy Act (WEPA), WIS. STAT. § 1.11 (2023-24),[3] and failed to follow several master planning laws.[4]    After NRB approved the 2016 Master Plan, Alliance filed a

_____

[1]  We adopt Alliance's use of the term "high-impact uses" for convenience, but we note that this is not a term defined in statutes, regulations, the 2016 Master Plan, or elsewhere.

[2]  The use of SPSRA lands for high-powered rocketry was ultimately not approved in the final 2016 Master Plan.

[3]  All references to the Wisconsin Statutes are to the 2023-24 version.

[4]  Alliance also alleged that the 2016 Master Plan violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 to 4370m-11. Alliance has not pursued any NEPA argument on appeal. Thus, we consider this argument to be abandoned. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998). Furthermore, any argument that the 2016 Master Plan violated NEPA has been settled by the Seventh Circuit Court of Appeals. *Sauk Prairie Conservation All. v. United States Dep't of Interior*, 944 F.3d 664, 666-67 (7th Cir. 2019).

4

second petition for judicial review in Sauk County Circuit Court, generally raising the same issues but as to the now final 2016 Master Plan. The second petition was consolidated with the first into the same proceeding.

¶8     Alliance also filed two requests with DNR for a contested case hearing, in which Alliance sought the opportunity to introduce evidence of the effect the high-impact uses would have on the land and of other defects in the 2016 Master Plan. DNR denied both of Alliance's requests, prompting Alliance to file two more petitions for judicial review in Sauk County Circuit Court in 2017 seeking judicial review of DNR's denials of Alliance's requests for a contested case hearing. Both of these petitions for judicial review were also consolidated into the same case with Alliance's prior petitions for judicial review.

¶9     Following briefing on the matter of the contested case hearing, the circuit court granted Alliance's request,[5] and the matter was referred to Administrative Law Judge (ALJ) Mark Kaiser for a contested case hearing. ALJ Kaiser set eight issues to be addressed and held a hearing over the course of four days, from January 14 to 17, 2019. Alliance presented testimony from twelve witnesses, and DNR presented testimony from another nine witnesses. In all, the hearing resulted in thousands of pages of additional testimony and exhibits being added to an already extensive record. Following the hearing, ALJ Kaiser referred the matter to NRB. The record given to NRB included more than 13,000 pages of documents, thousands of additional documents added by stipulation of the parties, and audio recordings. On October 22, 2019, NRB held a vote at one of its

---

[5] The Honorable Guy D. Reynolds entered the order granting Alliance's request for a contested case hearing.

5

meetings and reapproved the 2016 Master Plan, with the high-impact uses. No written decision was issued following the contested case hearing.

¶10 Alliance subsequently filed a fifth petition for judicial review in Sauk County Circuit Court on November 21, 2019, in which Alliance raised most of its original claims that the 2016 Master Plan violated NEPA, WEPA, and other state master planning laws. In this fifth petition, Alliance also added claims involving deficiencies in the contested case hearing and the resulting decision from NRB reapproving the 2016 Master Plan. Alliance further added DOA as a named party as a result of its involvement with holding the contested case hearing. This fifth petition was similarly consolidated into the same case with Alliance's four other petitions for judicial review.

¶11 On November 25, 2020, Alliance filed a motion to conduct discovery and hold an additional evidentiary hearing at which it could take testimony related to its claims of procedural irregularities in the contested case hearing. Through the additional discovery and testimony, Alliance sought to determine the extent of NRB's review of the materials from the contested case hearing prior to NRB reapproving the 2016 Master Plan. The circuit court granted Alliance limited discovery on the matter, and NRB board members submitted responses to interrogatories indicating whether they had received and reviewed the materials from the contested case hearing prior to voting to reapprove the 2016 Master Plan.

¶12 In August 2022, nearly six years after Alliance filed its first petition for judicial review, the parties began briefing on the merits of Alliance's petitions for review of the 2016 Master Plan. The parties also submitted supplemental briefing requested by the circuit court on the issue of whether Alliance had

standing. The circuit court held a hearing on November 1, 2023, at which it ultimately found in favor of DNR, NRB, and DOA, and dismissed Alliance's petitions.

¶13 At the hearing, the circuit court began by noting that the case was "a voluminous file" with tens and quite possibly hundreds of thousands of pages. The circuit court continued on to find that the Badger Reuse Plan was not a controlling document, stating that to call it a plan was a "relatively euphemistic title because it really wasn't that[.]" "[A]t no time was it a plan," and "[w]hat it was intended to do is make recommendations of values that should be considered in a draft plan." Thus, the circuit court found "no actual basis that it meets any of the criteria of a plan in the first place" and found "more importantly" that the circuit court lacked "any authority that [it] can choose out of the air a separate document and put it in place as the plan for this property." The circuit court further reviewed the deeds transferring the land to DNR and found that the land came with "extensive limitations and an extensive ongoing relationship with the United States Army," including use of the land for continued helicopter training and drills. The circuit court, therefore, found that it did not have "any authority" to void the agreement or otherwise require DNR to dishonor the agreement. Having rejected the Badger Reuse Plan and any authority over helicopter use at SPSRA, the circuit court found that it could not find that the 2016 Master Plan was deficient by allowing the so-called high-impact uses.

¶14 Alliance now appeals. Additional relevant facts will be set forth as necessary.

**DISCUSSION**

¶15    On appeal, Alliance raises thirteen issues that can be broken down into categories of issues related to what Alliance argues are procedural irregularities in the contested case hearing and then deficiencies with the substance and procedure of the 2016 Master Plan, which includes its compliance with WEPA and master planning laws.  In response, DNR and NRB raise the threshold issue of Alliance's standing to pursue claims alleging deficiencies in the 2016 Master Plan based on DNR's alleged noncompliance with the master planning laws.  DOA also raises two additional issues in the alternative as to whether, pursuant to WIS. STAT. § 227.53, DOA was properly made a party to this action and whether sovereign immunity applies to bar Alliance's claims against the DOA.

¶16    We turn first to standing before turning to Alliance's arguments on appeal.  As a result of our conclusions on the various arguments made by DNR, NRB, and Alliance, we do not address the alternative arguments raised by DOA.  *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").

## I.    Standard of Review

¶17    "When an appeal is taken from a circuit court order reviewing an agency decision, we review the decision of the agency, not the circuit court." *Lake Beulah Mgmt. Dist. v. DNR*, 2011 WI 54, ¶25, 335 Wis. 2d 47, 799 N.W.2d 73 (citation omitted).  We "shall not substitute [our] judgment for that of the agency as to the weight of the evidence on any disputed finding of fact."  WIS. STAT. § 227.57(6).  "[D]ue weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved."

Sec. 227.57(10). However, we "shall accord no deference to the agency's interpretation of law." Sec. 227.57(11). In general, we affirm the agency's action unless we find "a ground for not doing so." *Lake Beulah Mgmt. Dist.*, 335 Wis. 2d 47, ¶26; *see also* § 227.57(2).

## II. Standing

¶18 Standing is a two-part inquiry. First, we ask "whether the petition alleges injuries that are a direct result of the agency action." *Friends of Black River Forest v. Kohler Co.*, 2022 WI 52, ¶21, 402 Wis. 2d 587, 977 N.W.2d 342 (citation omitted). Second, we ask "whether 'the injury is to an interest which the law recognizes or seeks to regulate or protect.'" *Id.*, ¶23 (citation omitted). We "construe the law of standing liberally and even an injury to a trifling interest may suffice." *Friends of Blue Mound State Park v. DNR*, 2023 WI App 38, ¶25, 408 Wis. 2d 763, 993 N.W.2d 788 (citation omitted). "Whether a party has standing is a question of law that we review independently." *Friends of Black River Forest*, 402 Wis. 2d 587, ¶10 (citation omitted).

¶19 In this case, however, we assume for our purposes that Alliance has standing. *See Voters with Facts v. City of Eau Claire*, 2018 WI 63, ¶26, 382 Wis. 2d 1, 913 N.W.2d 131 (indicating that the court may assume standing to reach the merits). After several years of extensive proceedings, we do not find it productive to resolve this matter on the basis of a threshold issue, such as standing. Furthermore, DNR and NRB acknowledge that a lack of standing would not even dispose of this matter in its entirety because Alliance has standing to bring its WEPA claims. Therefore, we assume for our purposes that Alliance has standing, and we turn to the arguments that Alliance has raised on appeal. *See id.* However,

even reaching the merits of Alliance's numerous issues on appeal, we conclude that Alliance's claims fail.

### III.    Procedural Irregularities in the Contested Case Hearing

¶20    As noted, Alliance raises several issues on appeal about what it terms "procedural irregularity" stemming from the contested case hearing that was granted.    Alliance argues that there were multiple procedural irregularities including (1) ALJ Kaiser was required to prepare a written decision including findings of fact and conclusions of law but did not, (2) ALJ Kaiser erroneously excluded one of Alliance's expert witnesses for the reason that the expert witness improperly sought to provide legal opinions, (3) ALJ Kaiser improperly referred the matter to NRB for a decision, and (4) NRB's decision to reapprove the 2016 Master Plan following the contested case hearing violated due process and was unsupported by substantial evidence.  In identifying these procedural irregularities, Alliance seems to generally argue that it has not been afforded the procedural due process to which it is entitled with the contested case hearing it was granted.

¶21    In response, DNR and NRB argue that Alliance was not entitled to a contested case hearing in the first place.  However, should we reach the merits of Alliance's claims, DNR and NRB argue that Alliance's claims fail on the merits. Alternatively, DNR and NRB argue that, even assuming the existence of all the errors alleged by Alliance, any errors were not material such that they warrant any kind of reversal or remand for additional proceedings.

¶22    We turn first to the contention that Alliance was not entitled to a contested case hearing in the first place.  Whether a party has a right to a contested case hearing under WIS. STAT. § 227.42(1) is a question of law that we review

independently. *Haase-Hardie v. DNR*, 2014 WI App 103, ¶12, 357 Wis. 2d 442, 855 N.W.2d 443.

¶23 On this point, we note that the same issue about the right to a contested case hearing on a master plan was raised in a similar case before this court where a different environmental group sought judicial review of DNR's master plan for a state park. *Friends of Blue Mound State Park v. DNR*, 2025 WI App 63, __ Wis. 2d __, __ N.W.3d __. In that case, we concluded that DNR properly denied the request for a contested case hearing. *Id.*, ¶¶1-2. We explained that DNR regulations for master planning required public participation during the master planning process, but those regulations also provided DNR with discretion over the form of that public participation. *Id.*, ¶21. Therefore, the exception to the right to a contested case hearing in WIS. STAT. § 227.42(3) for "actions where hearings at the discretion of the agency are expressly authorized by law" applied, and there was no right to a contested case hearing. *Friends of Blue Mound*, 2025 WI App 63, ¶21. We further observed that holding a contested case hearing following the master planning process during which the public is able to participate and submit materials to DNR renders the public participation aspect of the master planning process redundant. *Id.*, ¶¶22-23.

¶24 We similarly conclude here that Alliance was not entitled to a contested case hearing, and for that reason alone, Alliance's claims stemming from the contested case hearing fail. However, we also agree with DNR and NRB that assuming the existence of any and all of the errors identified by Alliance related to the contested case hearing, those errors do not warrant reversal or remand for further proceedings of any kind. *See* WIS. STAT. § 227.57(4).

¶25    "The court shall remand the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure." *Id.*  In short, the fairness of the proceedings and the correctness of the action has not been impaired by any of the procedural irregularities that Alliance has identified related to the contested case hearing.

¶26    Alliance itself recognizes that, by way of the contested case hearing that lasted four days, it was able to introduce the testimony of twelve witnesses, DNR was able to present nine witnesses, and the parties collectively added thousands of additional pages to an already extensive record.  Alliance was further able to trigger another vote by NRB on whether to approve the 2016 Master Plan, and Alliance was still able to obtain judicial review of the 2016 Master Plan.  The circuit court similarly recognized that "the process here has been enormous" and the record amassed during these proceedings has exceeded hundreds of thousands of pages.  Indeed, the record in this appeal lists over 700 documents.  We conclude that there is, therefore, no need to remand this matter for additional proceedings related to the contested case hearing.

### IV.    Alliance's Discovery Request

¶27    Related to the contested case hearing, Alliance also argues that the circuit court erroneously denied Alliance's request to conduct discovery following the contested case hearing to determine what materials, if any, were reviewed by NRB members prior to deciding to reapprove the 2016 Master Plan.  While we need not address this argument because we conclude that Alliance had no right to a contested case hearing, we briefly address this issue for the sake of completeness.

12

¶28 In its discovery request, Alliance sought not only to conduct discovery but also to take deposition testimony or conduct an evidentiary hearing to determine exactly what materials the NRB members reviewed and each member's understanding of those materials. The circuit court, however, restricted Alliance to issuing limited interrogatories asking each NRB member if he or she received the materials from the contested case hearing and if each member sufficiently reviewed those materials to make an informed decision.

¶29 We review a circuit court's discovery order for an erroneous exercise of discretion. *Lane v. Sharp Packaging Sys., Inc.*, 2002 WI 28, ¶19, 251 Wis. 2d 68, 640 N.W.2d 788. "We will sustain a discretionary act if we find the [circuit] court examined the relevant facts, applied a proper standard of law, and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." *Id.* Having reviewed the record, we discern no erroneous exercise of discretion on the part of the circuit court in granting Alliance the opportunity to pose limited interrogatories to each NRB member.

## V. Alliance's Arguments About the 2016 Master Plan

¶30 Finally, we turn to Alliance's arguments related to the substance of the 2016 Master Plan itself. Generally speaking, Alliance's complaints about the 2016 Master Plan fall into two categories of violations of state laws: (1) that the 2016 Master Plan does not comply with the master planning laws, and (2) that the 2016 Master Plan does not comply with WEPA. For the most part, these violations are premised on the 2016 Master Plan's inclusion of high-impact uses—particularly the dual-sport motorcycling, the dog training and trialing, and the

helicopter training and drills by the Wisconsin Army National Guard[6]—as violations of the master planning laws and WEPA because they are in conflict with those low-impact and conservational uses contemplated by the Badger Reuse Plan.

¶31    Specifically as it applies to the master planning laws, Alliance argues that DNR violated several master planning laws by (1) failing to consider local and regional perspectives, including the local and regional perspectives embodied in the Badger Reuse Plan; (2) failing to consider the effects of high-impact uses on adjacent areas and avoiding adverse impacts where practicable; (3) treating the 2016 Master Plan as a new master plan and not an amendment to the Badger Reuse Plan; (4) approving high-impact uses that are inconsistent with the Badger Reuse Plan; and (5) failing to undertake the master planning process prior to designating SPSRA as a state recreation area.

¶32    As to WEPA, Alliance identifies nine areas in which Alliance contends the 2016 Master Plan violates WEPA: (1) it does not sufficiently identify or evaluate alternatives, (2) it used the wrong baseline, (3) it failed to adequately

---

[6] The Seventh Circuit Court of Appeals recognized that use of SPSRA for helicopter training and drills was originally requested by the Pentagon, that NPS had no say over this use when it transferred the land to DNR, and that the Army conditioned its approval of the land transfer to DNR on continued helicopter use. *Sauk Prairie Conservation All.*, 944 F.3d at 674, 679. Thus, the land transfer to DNR came with deed language requiring the use of SPSRA lands for helicopter training and drills by the Wisconsin Army National Guard. The Seventh Circuit stated, "It was the Army's land to begin with, and the Army would not release it without this provision. In other words, helicopter training was going to continue at [SPSRA] one way or another." *Id.* at 679. The circuit court likewise recognized that SPSRA was transferred to DNR with "extensive limitations and an extensive ongoing relationship with the United States Army," and the circuit court found it had no authority to void the agreement or otherwise require DNR to dishonor the agreement. We similarly conclude that this court lacks the ability to require DNR to void or dishonor the agreement allowing continued use of SPSRA lands for helicopter training and drills.

14

analyze environmental impacts or cumulative impacts, (4) it inappropriately limited the analysis to 15 years, (5) it did not adequately discuss mitigation measures, (6) it did not adequately evaluate consistency with plans or policies of federal, state, local, and tribal governments, (7) it did not include a summary of comments received and DNR's response to those comments, (8) it did not provide a list of state, federal, tribal, and local approvals, and (9) it failed to consult with agencies with jurisdiction or special expertise.

¶33    Having summarized Alliance's arguments and listed the many alleged violations, we turn to whether the 2016 Master Plan violates any of the state master planning laws or WEPA.

*Master Planning Law Violations*

¶34    Many of Alliance's arguments for violations of the master planning laws can be distilled down to one major theme—the Badger Reuse Plan is a document with legal force that dictates the uses that can be approved in the 2016 Master Plan. Thus, Alliance contends that the 2016 Master Plan violates several master planning laws because it is inconsistent with the Badger Reuse Plan that approved use of SPSRA lands only for low-impact and conservational use. In fact, Alliance argues that the Badger Reuse Plan is the operative master plan for SPSRA. The Badger Reuse Plan, however, has no such legal force.

¶35    Here we note that Alliance, in a parallel federal proceeding, pursued arguments that the inclusion of high-impact uses in the 2016 Master Plan were violations of the Property and Administrative Services Act and the National Environmental Policy Act (NEPA). *Sauk Prairie Conservation All. v. United States Dep't of Interior*, 944 F.3d 664, 666 (7th Cir. 2019). In that case, the Seventh Circuit Court of Appeals rejected Alliance's reliance on the Badger Reuse

Plan as restricting the use of the land for only low-impact uses. *Id.* at 671-72. The Seventh Circuit stated, "As far as we can gather from the record, the committee's recommendations were exactly that: recommendations." *Id.* at 671. Thus, the Seventh Circuit recognized that the Badger Reuse Plan's recommendation to allow low-impact uses at SPSRA was not binding. *Id.*

¶36    The circuit court reached a similar result below when it stated that calling the Badger Reuse Plan a plan was a "relatively euphemistic title." "[A]t no time was it a plan," and "[w]hat it was intended to do is make recommendations of values that should be considered in a draft plan." Thus, the circuit court found "no actual basis that it meets any of the criteria of a plan in the first place" and "more importantly, … any authority that [the circuit court] can choose out of the air a separate document and put it in place as the plan for this property."

¶37    We see no reason to disagree with the prior conclusions reached by the Seventh Circuit and the circuit court as to the nature of the Badger Reuse Plan. Rather, we take the Badger Reuse Plan for what it is, namely a recommendation to DNR to use SPSRA for low-impact and conservation uses. Indeed, the Badger Reuse Plan was drafted prior to DNR ownership of any land and was drafted by the Badger Reuse Committee, not DNR. A master plan, more properly, results from the master planning process specifically undertaken by DNR, when directed to do so by NRB. *See* WIS. ADMIN. CODE §§ NR 44.03(8), 44.04(2), (8) (through Nov. 2024). Thus, we are unpersuaded by Alliance's argument that DNR violated several of the master planning laws listed above because the Badger Reuse Plan was in some way an operative master plan or other sort of legally binding document.

¶38    Having so concluded, we are left with Alliance's argument that the master planning process itself was unlawful as a result of DNR's improper designation of SPSRA as a state recreation area. We are unpersuaded that any alleged violations with the designation of SPSRA as a state recreation area require any further discussion. As we noted previously, "[t]he court shall remand the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure." WIS. STAT. § 227.57(4). Any procedural irregularities in the designation of SPSRA as a state recreation area have not impaired the fairness of the proceedings or the correctness of the action. The proceedings in this case have been exhaustive, and we need not remand this matter to address any procedural irregularities stemming from the designation of SPSRA as a state recreation area.

*WEPA Violations*

¶39    "The scheme of WEPA is not proposed to control agency direction, but to require that agencies consider and evaluate the environmental consequences of alternatives available to them in the exercise of that consideration in the framework provided by [WIS. STAT. § 1.11]." ***Wisconsin's Env'l Decade, Inc. v. DNR***, 115 Wis. 2d 381, 389, 340 N.W.2d 722 (1983). WEPA is only "procedural in nature and does not control agency decision making." ***State ex rel. Boehm v. DNR***, 174 Wis. 2d 657, 665, 497 N.W.2d 445 (1993). "The purpose of WEPA is to insure that agencies consider environmental impacts during decision making." ***Id.***

¶40    To the extent that Alliance claims that the 2016 Master Plan violated WEPA because it did not provide adequate analysis on various topics, such as

17

reasonable alternatives, environmental impacts, and cumulative impacts, we consider that its arguments may be condensed down in large part to disagreement with the analysis done by DNR. Alliance seems to find DNR's analysis inadequate based on the length of the analysis in the 2016 Master Plan and its lack of consideration of the Badger Reuse Plan. WEPA is a procedural, and not a content, requirement, and we have already addressed above that the Badger Reuse Plan does not limit the ultimate uses approved in the 2016 Master Plan. Rather, we conclude that the analysis done by DNR in the 2016 Master Plan is sufficiently detailed to satisfy WEPA's requirements. As the Seventh Circuit already described, the 2016 Master Plan "included a meaningful explanation of why the DNR thought dog training and off-road motorcycle riding specifically would have a minimal impact, even when viewed in isolation." *Sauk Prairie Conservation All.*, 944 F.3d at 668.

¶41 Alliance also argues that the 2016 Master Plan did not evaluate the proper baseline. In other words, Alliance argues that the 2016 Master Plan should have compared the impact of the high-impact uses to what would occur if the property were used only for low-impact or conservation uses and the 2016 Master Plan should not have compared the proposed uses to the current uses. On this matter, we again recognize that the Seventh Circuit has already rejected Alliance's baseline claim in Alliance's parallel federal case under NEPA, which is WEPA's federal counterpart. *Sauk Prairie Conservation All.*, 944 F.3d at 677-78. In fact, the Seventh Circuit stated that Alliance's proposed baseline was considered as the baseline for evaluating dual-sport motorcycling and dog training and trialing. *Id.* Accordingly, we are also not persuaded that Alliance correctly asserts that the 2016 Master Plan violates WEPA because it considered the wrong baseline.

¶42 To the extent we have not specifically addressed each and every individual violation of the master planning laws, WEPA, or other state laws listed by Alliance, we decline to do so. As a result of the laundry list of violations identified by Alliance in its briefing, we consider many of these points to be inadequately developed, and we do not address them for this reason. *State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) ("We may decline to review issues inadequately briefed."). "An appellate court is not a performing bear, required to dance to each and every tune played on appeal." *State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978).

## CONCLUSION

¶43 In sum, Alliance raises several issues on appeal related to the 2016 Master Plan adopted for SPSRA and the contested case hearing that it was granted by the circuit court. We are not persuaded that Alliance's arguments warrant reversal or further proceedings in this matter, and therefore, we affirm the circuit court's order dismissing Alliance's petitions for judicial review.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.